## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

ROSE M. C.,[1]

               Plaintiff,

v.                                      ACTION NO. 2:21cv413

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Rose C. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

      An order of reference assigned this matter to the undersigned. ECF No. 13. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 17) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 19) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.    **PROCEDURAL BACKGROUND**

Rose C. ("plaintiff") protectively filed applications for benefits in 2019, alleging she became disabled on April 1, 2016, due to several mental and physical impairments.[2]  R. 34, 37, 82–83, 243–60.  Following the state agency's initial and reconsideration denials of her claim, R. 82–101, 106–29, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 181.  ALJ Carol Matula held a telephonic hearing on October 28, 2020, and issued a decision denying benefits on November 13, 2020. R. 34–42, 47–66.  On May 20, 2021, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–6.  In doing so, the Appeals Council found that certain additional medical records supplied by plaintiff were already in the record and that other, additional medical opinion evidence was insufficient to show a reasonable probability of changing the outcome before the ALJ. R. 2.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on July 22, 2021. ECF No. 1.  The Commissioner answered on October 26, 2021.  ECF No. 11.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on January 26 and February 25, 2022, respectively. ECF Nos. 17–20. Plaintiff filed a reply on March 21, 2022.  ECF No. 21.  As oral argument is unnecessary, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record the Commissioner previously filed with the Court.

## II.   **RELEVANT FACTUAL BACKGROUND**

Plaintiff presents two issues.  First, she argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to develop the record about the impact of plaintiff's cardiac impairment on her RFC and inadequately explained why plaintiff's allegations of disabling limitations were not fully credited.  Pl.'s Mem. Law Supp. Soc. Sec. Appeal ("Pl.'s Mem."), ECF No. 18, at 9–12.  Second, she asserts that the Appeals Council erroneously denied her request for review of new and material evidence supporting her claim of disability.  *Id.* at 13–15.  The facts germane to these issues are noted below.

### A.    *Hearing Testimony by Plaintiff and Other Information*

At the October 28, 2020 hearing before the ALJ, plaintiff provided the following information.  She was then 57 years old, single, and living with, and at, her mother's Virginia Beach residence.  R. 49, 52, 60.  She reports that she and her mother take care of one another.  R. 54.  Plaintiff completed high school and an additional year of education to obtain a certification for office work.  R. 52; *see* R. 275.  Before an April 2016 heart attack, plaintiff worked as an insurance and benefits clerk, and did janitorial and cleaning work on the side.  R. 51, 58–60 (reporting she was "not supposed to be living right now" due to suffering a "widower's heart attack").  Plaintiff asserts she can no longer work as a benefits clerk, due to the heavy workload and associated stress and anxiety, as well as her need for rest and daily naps.  R. 58–59.  Also, as her prior janitorial job involved extensive cleaning and lifting, plaintiff implied an inability to resume that work, as well.  R. 58; *see also* R. 57–58 (noting her limited ability to sit, stand, and walk).

As for heart-related symptoms, plaintiff reports having "shortness of breath at times," occasional heart palpitations, chest and arm pain, and regularly feeling tired and overwhelmed.  R.

53–54.  She continues to follow her cardiologist's instruction not to lift anything weighing over 10 pounds.  R. 55; *but see* R. 759 (noting limited duration of lifting restriction, and thereafter allowing resumption of "full activity").

Plaintiff also suffers from arthritis, with occasional pain in her left shoulder, left leg (below the knee), and right hip.  R. 56–57.  Apparently, plaintiff has fallen several times when her hip sometimes "just give[s] out."  R. 57.  She treats arthritic pain using a gel rub prescribed by the doctor who diagnosed her arthritis.  R. 54 (referencing Baclofen HCL gel), 57.

Plaintiff is licensed and drives short distances to the store, although she dislikes doing so. R. 52.  She shops for groceries but is limited by the 10-pound lifting restriction noted above.  R. 55.  Her siblings help with shopping by carrying heavy bags for plaintiff.  *Id.*  Plaintiff and her mother share tasks, such as cooking and cleaning, but infrequently do either.  *Id.* (fixing sandwiches and using the oven and vacuuming about "twice a month").  Due to fatigue, plaintiff rarely exercises, aside from walking around the house and occasionally going outside to walk to the corner two houses away and back.  R. 55–56.  Although she used to have pain when getting dressed, this no longer occurs, except when her leg hurts.  R. 56.  Plaintiff can sit for roughly 30 minutes before needing to rise and move around.  R. 57–58.  She can remain standing at any one time for no more than 10–15 minutes.  R. 58.

Plaintiff socializes little, other than with family.  R. 56.  Due to the COVID-19 pandemic, she stopped attending and turned to watching church services remotely.  *Id.*  Plaintiff's hobbies include listening to church music and watching television.  *Id.*

Plaintiff's February 8, 2020 function report contains similar information.  R. 316–23. Among the additional details provided are:  (1) an inability to handle stress and anxiety, coupled with a deep-seated fear of having another heart attack, R. 316, 321; (2) daily activities that include

walking on a treadmill, R. 316; (3) a need for reminders to take medications, R. 317; (4) fatigue that precludes cutting the grass and limits daily meal preparation to sandwiches and canned or frozen vegetables, R. 317, 320; (5) spending roughly four hours per week doing cleaning and laundry, R. 317; (6) using a cane, R. 321; (7) sleep difficulties due to leg and hip pain and swelling in her feet, R. 318; (8) a limited attention span (one hour), and some problems following written and spoken instructions, R. 322; and (9) an ability to walk a quarter of a mile, followed by a need for a 20 minute rest break, *id.*

Plaintiff reported that her conditions detrimentally affect her memory, understanding, concentration, and the ability to finish tasks. *Id.* Nervousness and a desire to avoid stress also make it harder to get along with others and authority figures. R. 321–22. Although able to engage in personal care tasks without issue, plaintiff advised that her conditions affect her ability to lift, squat, bend, kneel, reach, walk, stand, and climb stairs. R. 318, 322.

## B.      *Hearing Testimony by Vocational Expert*

Herman Bates, a vocational expert ("VE"), also testified at the hearing. R. 47, 60–65. Based on the ALJ's hypotheticals and identified limitations and plaintiff's background and employment, VE Bates opined that plaintiff could return to past relevant work as an insurance benefits clerk, but not to housekeeping and cleaning. R. 62 (opining that this was true whether the clerking was classified as light or sedentary work, with a limitation to only four hours standing and walking). VE Bates also opined that plaintiff's skills in customer service and financial and clerical recordkeeping were transferable to other jobs in the national economy and in the same industry, as a medical records clerk and as a hospital customer service representative. R. 63–64.

### C.   *Relevant Medical Record*[3]

### 1.   *Treatment at Sentara Leigh and Sentara Heart Hospital*

After feeling unwell for two weeks, on April 2, 2016, plaintiff went to Sentara Leigh Hospital for chest pain, shortness of breath, and coughing.  R. 746, 1114–15.  Plaintiff was diagnosed with an acute myocardial infarction.  R. 744–46 (noting ST elevation myocardial infarction ("STEMI") and "acute systolic heart failure after [left anterior descending] thrombosis"), 1111 (noting "cardiogenic shock").  Due to the emergent nature of her condition and her acute respiratory distress, plaintiff received a blood transfusion, was intubated, and Dr. Scott Robertson performed a cardiac catheterization without complications.  R. 753–55 (listing procedures performed as left and right heart catheterization, coronary angiography, left ventriculography, percutaneous coronary intervention, and intra-aortic balloon pump), 1145 (noting opening of left anterior descending coronary artery with metal stent and balloon angioplasty, and 35% ejection fraction).  Plaintiff was then transferred to the intensive care unit at the Sentara Heart Hospital.  R. 753; 757 (noting plaintiff was "[c]ritically ill and survival is uncertain").

Plaintiff received treatment at the Sentara Heart Hospital for approximately five days.  On April 3, 2016, her intra-aortic balloon pump was removed.  R. 753.  On April 4, 2016, plaintiff's breathing tube was removed.  *Id.*  She briefly developed a fever, which soon resolved, and was discharged on April 7, 2016.  R. 753, 758–59.  Due to her low ejection fraction (20–25%) and acute systolic congestive heart failure, plaintiff was discharged with a personal defibrillator,

---

[3] To facilitate understanding of plaintiff's health status, the Court reviews the medical record beginning in April 2016 through the date of the ALJ's decision, November 13, 2020.  Plaintiff, however, previously sought and was denied disability and supplemental security benefits in an ALJ decision dated August 21, 2018.  R. 67–77.  *Res judicata* precludes re-litigation of plaintiff's previously denied claim.  *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476–77 (4th Cir. 1999).

known as a LifeVest.  R. 510, 610–12, 753.  Plaintiff's discharge notes classified her as "[a]febrile, [a]mbulating, [e]ating, [d]rinking, [v]oiding, and [s]table."  R. 758; *see* R. 546 (noting plaintiff "feels well [and] [w]ants to go home"), 766 (noting plaintiff's "significant improvement").  Her discharge instructions precluded exercise, pushing, pulling, stooping, or lifting items weighing more than 10 pounds for one week after her catheterization; but permitted walking and climbing stairs one day after the procedure and resumption of full activities after one week.  R. 759.  Plaintiff was also discharged with recommendations for physical and occupational therapy and use of a "front wheeled walker."  R. 539, 772–73.

### 2.   *Treatment at Sentara Cardiology Specialists*

On April 14, 2016, plaintiff followed up with her cardiologist, Dr. Robertson, at Sentara Cardiology Specialists ("SCS").  R. 482–85.  Dr. Robertson noted that plaintiff, who used a walker and was wearing a LifeVest, had done well since her hospitalization and had no chest pain or shortness of breath with daily activities, which she was gradually increasing.  R. 483.  Plaintiff denied having peripheral swelling, leg cramps, stroke symptoms, palpitations, syncope, or falls.  *Id*.  Dr. Robertson's physical examination also revealed normal findings and noted that plaintiff was medication compliant and that her blood pressure was under control.  R. 483–84.

During April 28 and May 19, 2016 follow-up examinations at SCS, Nurse Practitioner ("NP") Donna Balgavy assessed plaintiff.  R. 474–77, 479–81.  Plaintiff reported as "doing" or "feel[ing] well" and normal physical examinations confirmed the same.  R. 475–76, 480.  NP Balgavy's impressions included "stable" coronary artery disease, blood pressure, and cardiomyopathy.  R. 475, 480.  She continued plaintiff on her current medication regimen, referred her to cardiac rehabilitation and to an OB-GYN, and directed plaintiff to return in July 2016 to assess her ejection fraction.  *Id*.

On July 14, 2016, plaintiff underwent an echocardiogram, which revealed an improving ejection fraction (45%), compared to the 25% recorded on April 5, 2016.  R. 600–02.  Plaintiff also met with Dr. Robertson, who noted that her left ventricular systolic dysfunction, including her ejection fraction, has "markedly improved." R. 471–72.  Dr. Robertson described plaintiff as "very well since last seen" and noted her continuing denials of syncope, leg cramping, swelling, and stroke symptoms. R. 472; *see* R. 473 (noting normal exam findings).  Although ordering assorted lab work, Dr. Roberson diagnosed coronary artery disease, occlusive, without angina, ischemic cardiomyopathy, and chronic systolic congestive heart failure. R. 472; *see* R. 470–71 (noting labs showed anemia was "much better" and her cholesterol was "well controlled").  He recommended continuing plaintiff's blood pressure and statin medication regimen and directed, due to her improved systolic function, trying to wean plaintiff off Lasix. R. 471–72.

At a follow-up appointment on August 11, 2016, plaintiff appeared to be tolerating the lower dose of Lasix, and NP Balgavy reduced it further. R. 468.  Although a physical examination yielded normal findings, plaintiff reported that she continued to feel tired. *Id.*

On October 13, 2016, Dr. Robertson again evaluated plaintiff. R. 464–67.  Although her blood pressure was somewhat elevated, physical exam findings were normal, and Dr. Robertson described plaintiff as "doing great," "feeling good," and noted she had returned to work. R. 465.  He also noted, plaintiff had some functional limitations, was unable to move at a quick pace, "cannot lift heavier items," and experiences shortness of breath when doing "mild to moderate activity." *Id.*  Dr. Robertson continued the recommendations and diagnoses previously made, indicated that plaintiff would benefit from cardiac rehabilitation, issued another referral, and expressed concern that insurance previously denied coverage for the same. R. 464–65; *see* R. 985.

On February 2, 2017, plaintiff followed up with NP Balgavy. R. 457–59.  A review of

systems and physical examination findings were normal, except plaintiff's blood pressure was elevated and she reported needing to take her medication. R. 458. Although plaintiff reported feeling tired at times with some shortness of breath and chest tightness when lifting a "heavy box," NP Balgavy stated she was "doing well overall." *Id.* (noting also that plaintiff was "still limited some with exertional activity"). Plaintiff reported never hearing back about cardiac rehabilitation and NP Balgavy promised to investigate and arrange a wellness program consultation. *Id.*

On February 14, 2017, plaintiff received a healthy lifestyle (diet, nutrition, and exercise) consultation, materials, and counseling from Dr. Gunadhar Panigrahi at SCS. R. 450–53. Aside from elevated blood pressure, a review of systems and physical exam were normal. R. 451–53 (noting decision to increase dosage of blood pressure medication). Exam notes indicate that, although plaintiff's condition improved with medical management, she was not yet "physically . . . up to par." R. 451. Plaintiff said she was able to do housework, but not "outside work[]." *Id.* She also reported experiencing chest discomfort and mild shortness of breath when lifting heavy items. *Id.*

On June 29, 2017, plaintiff had a follow-up exam with NP Balgavy. R. 432–34. Plaintiff reported having general fatigue and tiring easily, but her physical exam findings were normal, other than a slightly elevated blood pressure. R. 432–33. NP Balgavy encouraged plaintiff to exercise more and ordered an echocardiogram to reassess her ejection fraction. R. 432. Testing performed on August 15, 2017, showed continuing improvement in plaintiff's ejection fraction (50%), and other findings like those noted in the test from July 14, 2016. R. 589–93, R. 918 (noting "low normal left ventricular systolic function, ejection fraction 50%")

On December 28, 2017, plaintiff had a follow-up visit with NP Balgavy. R. 420–25. Other than exhibiting elevated blood pressure and needing to take her medication, plaintiff's overall

condition remained stable, and she reported feeling "well overall," despite soreness from a recent fall. R. 421. A review of systems and physical exam findings were normal, and NP Balgavy described plaintiff's recent ejection fraction (50%) as "normal." *Id.*

During a six-month checkup on June 21, 2018, plaintiff's condition remained essentially unchanged. R. 409–14.

On December 27, 2018, Dr. Robertson examined plaintiff and noted her "miraculous recovery" since 2016, as evidenced by her normal ejection fraction and the absence of "symptoms of heart failure." R. 400–01. Based upon a normal examination and review of recent lab work, he described plaintiff's cholesterol as "under excellent control," her blood pressure as "well controlled," and found no need for continued antiplatelet therapy with Plavix, given the passage of two years and a barely audible heart murmur. *Id.* Dr. Robertson encouraged plaintiff to pursue a healthy diet, exercise, and weight loss. R. 400.

On October 14 and November 25, 2019, plaintiff was again treated at SCS. R. 393–99. On October 14, 2019, due to plaintiff's high and "not well controlled" blood pressure (169/96), NP Balgavy prescribed a greater dose of lisinopril, and scheduled a return visit. R. 395–96. On November 25, 2019, plaintiff's blood pressure had dropped to 142/84 and she was told to monitor and call if the readings consistently exceeded 140. R. 393.

On May 28, 2020, plaintiff treated with Dr. Robertson. R. 845–57. He found plaintiff's heart condition to be unchanged, but noted plaintiff reported "some problems with arthritis of her hands and feet and occasional pains there." R. 848. He noted plaintiff reported no chest pain (with or without exertion), shortness of breath, swelling, leg cramping, syncope, or symptoms of stroke. *Id.*. Dr. Robertson ordered another echocardiogram, which revealed no significant changes from the prior testing. R. 851–52.

### 3.  Treatment at Sentara Family Medicine Physicians and Other Sentara Hospitals

On April 11, 2016, plaintiff began receiving treatment from Sentara Family Medicine Physicians and NP Leah Stewart. R. 485–88. NP Stewart's physical examination revealed normal findings, including a normal cardiovascular rate and rhythm, normal pulmonary and chest function, and a normal mood. R. 487.

During a May 11, 2016 appointment with NP Stewart, plaintiff reported slowly regaining her strength, but also tiring easily. R. 478. A physical examination revealed normal findings. *Id.* To treat continuing anemia, NP Stewart prescribed an increased dose of daily iron supplements. R. 477–78.

On October 18, 2016, plaintiff met with NP Stewart, reported "feeling well," and requested renewal of a handicapped parking pass. R. 462–63. NP Stewart ordered additional lab work, but noted normal physical exam findings, "okay" blood pressure readings, and the absence of ankle swelling. *Id.*

On March 7 and 10, 2017, plaintiff reported driving herself to and began cardiac rehabilitation at Sentara Princess Anne Hospital. R. 443–50. Plaintiff denied having chest pain or sleep problems, but indicated she "[t]ires when she 'does too much' at home or walks long distances." R. 444–45. With respect to exercise, the assessment indicates that plaintiff does some walking without use of any assistive devices and listed as orthopedic limitations, "[m]inor arthralgia in the left ankle and right hip." R. 445. Plaintiff reported changing her diet since the heart attack to eat and drink more healthy foods and reported preparing her own meals two to three times per day. R. 446. Plaintiff reported substantially lower stress levels due to not working and resolution of issues with a friend and denied having anxiety or depression. *Id.* During a physical assessment, plaintiff: (1) exhibited high blood pressure; (2) reported having no pain; and (3) was

classified as a moderate fall risk. R. 446–47. Exercise goals were set to improve plaintiff's exercise tolerance and increase the endurance and intensity of thrice weekly supervised, moderate exercise. R. 448. Plaintiff scored 47 on a "rate your plate" diet assessment tool, which specified a need to take additional steps for healthier eating. *Id*. Plaintiff's BMI was 33.58 and a target goal of less than 25 was established. *Id*. A patient health questionnaire assessment classified plaintiff as having "mild depression." R. 449.

In late March 2017, plaintiff had lab work and a six-month follow-up visit with NP Stewart. R. 439–40. Plaintiff reported "feeling better" and NP Stewart found her blood pressure had improved. R. 440. With respect to plaintiff's anemia, NP Stewart noted symptoms of mild fatigue. *Id*. The findings in a review of systems and physical exam were unremarkable. R. 441; *see* R. 439 (noting that "lab results look good . . [and] kidney function is back to normal").

On April 5, 2017, plaintiff completed her twelfth cardiac rehabilitation exercise session. R. 436 (noting stoppage due to insurance's failure to cover costs). At graduation, plaintiff said she planned to join a gym, due to increasing activity tolerance and energy levels. R. 436–37 (noting plaintiff walked for a half-hour on a treadmill and was encouraged to walk regularly now). Due to dietary changes, her dietary score decreased, and plaintiff failed to make progress on her BMI target. R. 437. Plaintiff was described as "positive and highly motivated," with plans to exercise three mornings per week. R. 437–38.

On October 23, 2017, plaintiff saw NP Stewart for a follow-up exam and complained of heel pain, which improved with more walking. R. 429–31. NP Stewart diagnosed plantar fasciitis in the left foot and prescribed naproxen and exercises. R. 430. Treatment notes reflect that plaintiff denied chest pain, shortness of breath, swelling, and fatigue. *Id*. NP Stewart's exam findings were normal, aside from elevated blood pressure. R. 431.

On December 16, 2017, plaintiff went to Sentara Virginia Beach General Hospital, complaining of pain in her right arm and knee/leg, after tripping and falling the night before. R. 425–26. Plaintiff exhibited a normal gait and a physical exam revealed normal findings, except for tenderness along the lateral joint line of the right knee and in the right upper arm. R. 426–27. After x-rays revealed no breaks or fractures of her right upper arm, plaintiff was discharged with instructions for ice, elevation, and Tylenol, as needed. R. 426–28.

On October 1, 2018, plaintiff visited NP Stewart and complained of recent pain in her right foot and hip that resolved with rest and elevation over the prior weekend. R. 406. NP Stewart's notes reflected normal physical exam findings and that plaintiff "exercise[d] daily." R. 406–07.

On February 12, 2020, plaintiff treated with NP Stewart for a urinary tract infection ("UTI"). R. 1020–21. During the examination, NP Stewart noted that plaintiff reported no heart complaints or symptoms and denied having ankle swelling or shortness of breath. R. 1021. NP Stewart also noted, with respect to plaintiff's anemia, that she denied having fatigue, shortness of breath, or other symptoms. *Id.* Aside from UTI complaints, a review of systems and physical exam were unremarkable. R. 1021,1023; *see* R. 1012–17 (noting unremarkable findings, including mild leg pain, from an April 9, 2020 telehealth visit).

On June 17, 2020, plaintiff treated with NP Stewart and complained of "on and off joint pain in multiple joints for several years," indicating that her sister has rheumatoid arthritis and her mother has osteoarthritis. R. 1005. A review of systems was positive for arthralgias and joint tenderness but negative for myalgias, neck or back pain, or falls. R. 1006. Physical exam findings were normal, except for left shoulder pain, and tenderness in both wrists and in the right hip. R. 1007. NP Stewart prescribed Voltaren topical gel to treat the discomfort and ordered lab work. R. 1006, 1010; *see* R. 1008–09 (noting lab work was negative for antinuclear antibodies and a

13

rheumatoid arthritis factor screen fell within normal limits).

### 4.       *State Agency Physician Reviews*

On February 27, 2020, Robert McGuffin, M.D., a state agency consultant, reviewed plaintiff's medical record. R. 85–89, 95–99. Dr. McGuffin assessed that plaintiff: (1) could, with normal breaks, stand and/or walk roughly 6 hours in an 8-hour work day; (2) could sit for the same time period; (3) could lift 20 pounds occasionally, and 10 pounds frequently; (4) could push or pull without restrictions, other than as to the total weight to be moved; (5) could occasionally stoop, kneel, crouch, and crawl; (6) could climb ramps and stairs and balance without restriction, but never climb ladders, ropes, or scaffolds; (7) had no manipulative, visual, or communicative limitations; and (8) needed to avoid concentrated exposure to extreme temperatures, wetness, humidity, noise, vibration, pulmonary irritants, and workplace hazards. R. 87–88, 97–98.

At the reconsideration level, on May 7, 2020, Jack Hutcheson, M.D., reached findings identical to those of Dr. McGuffin. R. 114–15, 126–27. Dr. Hutcheson explained that the evidence of record supported only "light work limitations" and that plaintiff "could reasonably fulfill light work." R. 115, 127.[4]

## III.       THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[5] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether

---

[4] Due to the lack of any medically determinable mental health impairments and any treatment or medication for mental health conditions, no non-exertional limitations were identified by the state agency psychologists. R. 86, 96, 112, 124.

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; and (4) had an impairment that prevents her from performing any past relevant work in light of her RFC. R. 37–42.

The ALJ found that plaintiff met the insured requirements[6] of the Social Security Act through June 30, 2021, and had not engaged in substantial gainful activity from April 1, 2016, her alleged onset date of disability. R. 34, 37.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) obesity; and (b) myocardial infarction status, post stenting. R. 37. The ALJ classified plaintiff's other impairments, including hypertension, hyperlipidemia, and anemia, as non-severe. R. 37–38. The ALJ also concluded that plaintiff's reported rheumatoid arthritis, osteoarthritis of the back and hip, and PTSD and anxiety, failed to qualify as "medically determinable impairments" due to, among other things, the lack of objective evidence, medical signs, laboratory findings, imaging, or confirming diagnoses. R. 38. The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 38–39.

The ALJ next found that plaintiff possessed a residual functional capacity ("RFC") for sedentary work, *see* 20 C.F.R. §§ 404.1567(a), 416.967(a), subject to limitations for: (a) no

_____

continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[6] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

crawling or climbing of ladders, ropes, or scaffolds, or exposure to moving parts and unprotected heights; and (b) only occasional stooping, kneeling, or crouching, as well as only occasional exposures to temperature extremes, humidity, wetness, vibration, or noises louder than office environs. R. 39.

At step four, the ALJ found that plaintiff could resume working as an insurance and benefits clerk. R. 42. The ALJ relied on the vocational examiner's testimony that someone of plaintiff's age with the foregoing RFC could perform such a job and that such work constituted a sedentary occupation. R. 42; *see* R. 325 (reporting plaintiff's customer service job involved sitting eight hours per day); *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a). Therefore, the ALJ found that plaintiff was ineligible for benefits as she was not disabled from April 1, 2016, through the date of the decision, November 13, 2020. R. 42.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence,

16

make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.   **ANALYSIS**

### A.   *Substantial evidence supports the ALJ's assessment of plaintiff's residual functional capacity.*

Plaintiff seeks a remand arguing that the ALJ's determination of plaintiff's RFC is unsupported by substantial evidence. Pl.'s Mem. 9–12. Plaintiff contends that the record before the ALJ was insufficient to determine whether plaintiff could regularly work, due to uncertainty about restrictions resulting from her cardiac impairment. *Id.* at 9–11. Faced with such a record, plaintiff argues that the ALJ failed to investigate and develop the record, by either seeking additional information from Dr. Robertson or NP Stewart or ordering a consultative examination. *Id.* at 11. Plaintiff also argues that, in assessing plaintiff's RFC, the ALJ found plaintiff's assertions of disabling limitations to be "less than credible" without good reason, and by "minimiz[ing]" and "mischaracteriz[ing] her allegations" about her limitations. *Id.* at 11–12.

The Commissioner argues that the ALJ's RFC determination is well-supported. Mem. Supp. Def.'s Mot. Summ. J. and Opp. Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 20, at 15–

21. Notwithstanding plaintiff's 2016 heart attack, the Commissioner asserts that the robust record, including the notes of plaintiff's cardiologist examined by the ALJ, shows that she made a remarkable recovery and is able to perform a limited range of sedentary work. *Id.* at 15–18. To the extent that plaintiff has continuing limitations, the Commissioner argues that the ALJ identified and accounted for them in assessing the RFC and finding plaintiff could return to working as a benefits clerk. *Id.* at 17–18. As the record contained sufficient information to make an informed judgment, the Commissioner asserts that the plaintiff and her counsel failed to meet the burden of presenting evidence sufficient to support a finding of disability. *Id.* at 18–20 (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1)). Finally, the Commissioner argues that the ALJ weighed plaintiff's subjective complaints about her limitations against the record as a whole and properly found them wanting. *Id.* at 20–21.

### 1.   *The record contained sufficient information for the ALJ to assess plaintiff's RFC.*

As part of the five-step sequential analysis, an ALJ must determine a claimant's RFC. *See* 20 C.F.R. §§ 404.1545, 416.945. The RFC describes "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week . . . ." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5).

18

The determination of the RFC "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c)).[7]   The agency's responsibility is to "develop [a claimant's] complete medical history," upon which a determination about disability may be made. 20 C.F.R. §§ 404.1512(a)(2), (b)(1), 416.912(a)(2), (b)(1).   In some cases, the evidence of record is "insufficient" – that is, lacking the information needed to assess disability, or "inconsistent" – that is, "conflict[ing]," "ambiguous," or not "based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. §§ 404.1520b(b), 416.920b(b).   Depending on the issues in any given case, the agency "may" seek additional evidence, for example, by recontacting medical sources, seeking more information, or by ordering a consultative examination ("CE").[8]   20 C.F.R. §§ 404.1520b(b), (b)(2)(i)–(iv), 416.920b(b), (b)(2)(i)–(iv); *see also* 20 C.F.R. §§ 404.1519a(b) (describing when a CE may be sought), 416.919a(b) (same).

---

[7] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

[8] Plaintiff relies on inapplicable, prior regulations to argue that "if the information needed to make a determination is not readily available from treating source records, and a clarification cannot be obtained, the ALJ *is obligated* to obtain a consultative examination." Pl.'s Mem. 10–11 (citing 20 C.F.R. §§ 404.1512(f), 416.912(f)) (emphasis added); *see also* Pl.'s Reply Def.'s Mot. and Supp. Mem., ECF No. 21, at 3 (citing 20 C.F.R. §§ 404.1512(f), 416.912(f)).   As noted in *Dean v. Berryhill*, No. 1:15CV1095, 2017 WL 684196, at *7 (M.D.N.C. Feb. 21, 2017), however, the pertinent regulations were substantially revised in 2012 and, among other changes, "now allow ALJs substantial discretion in deciding whether to recontact a treating physician for additional or clarifying information." *See* 77 Fed. Reg. 10651-01, 2011 WL 7404303 (Feb. 23, 2012); 76 Fed. Reg. 20282-01, 2011 WL 1359404, at *20282–83–84 (Apr. 12, 2011); *see also Harper v. Saul*, No. 4:19-cv-01535-CMC, 2020 WL 6074164, at *8 n.9 (D.S.C. Oct. 15, 2020) (noting that "[e]ffective March 26, 2012, § 404.1520b replaced § 404.1512(e)").

The regulations, however, only require an ALJ "to seek additional evidence or clarification if the ALJ cannot reach a conclusion about whether the claimant is disabled based upon the evidence in the case record." *Harper v. Saul*, No. 4:19-CV-015350-CMC, 2020 WL 6074164, at *8 (D.S.C. Oct. 15, 2020). To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411-HEH, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012) (citation and quotation omitted). As the Fourth Circuit noted in *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citation and quotation omitted), "[a]lthough the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, [the ALJ] is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *See also Lehman v. Astrue*, 931 F. Supp. 2d 682, 693 (D. Md. 2013) (noting that an "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case") (citation omitted). Finally, while the ALJ is obligated to develop and assess the record, the burden remains on a claimant to prove that she is disabled, and to furnish known evidence of the same to the agency. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1); *see also Bowen v. Yuckert*, 482 U.S. 137, 147–48 (1987) (noting that a claimant bears the burden of proving her severe impairments preclude performance of any substantial gainful activity).

Here, the record contained ample evidence to enable the ALJ to assess disability and no need existed to seek further information from Dr. Robertson or NP Stewart or to seek a CE. Although the plaintiff previously sought benefits and was found not to be disabled on August 21, 2018, the ALJ extensively reviewed the record evidence relating to plaintiff's conditions dating back to April 2016, when plaintiff had her heart attack, through mid-2020. R. 37–41; *see Gullace*

20

*v. Astrue*, No. 1:11cv0755, 2012 WL 691554, at *15 n.18, *24 (E.D. Va. Feb. 13, 2012) (noting that evaluations made long before onset date need not be considered), *report and recommendation adopted*, 2012 WL 688488 (Mar. 2, 2012). The ALJ's uncontested finding is that plaintiff suffered from only two severe impairments:  obesity and myocardial infarction status post-stenting. R. 37. Notably, although plaintiff complained of work-related stress and anxiety, R. 58–59, the ALJ found she had no medically determinable mental impairments, and noted the record contained no results of mental status exams or reports of an anxious affect, nightmares, hypervigilance, tending to support diagnoses of either PTSD or anxiety, R. 38.  Similarly, the ALJ found no evidence of impairments relating to plaintiff's blood pressure ("controlled"), "mild anemia," cholesterol ("'under excellent control'"), and allegations of arthritis and osteoarthritis of the back and hip (noting "lack of objective evidence" and negative test results). R. 37–38.

The ALJ reviewed plaintiff's serious and acute cardiac episode and extensive treatment in April 2016. R. 40.  She also discussed plaintiff's course of treatment thereafter. R. 40–41.  The ALJ reviewed, among other things:  (1) plaintiff's immediate improvement, post-procedure, and her gradually increasing activities over time; (2) plaintiff's repeated denials to treating providers of shortness of breath and chest pain upon exam, as well as the lack of edema in her extremities; (3) plaintiff's post-procedure, ejection fraction improvement, which was recorded at 25% on April 5, 2016, but markedly increased to 45% by July 2016, and then to 50% by August 2017, which was assessed to be "normal"; (4) plaintiff's report that she was "feeling good" and the cardiologist's assessment that she was "doing well" and "had 'made a miraculous recovery'"; (5) plaintiff's reports of fatigue, some difficulty with moving at a fast pace, and with lifting heavy items and boxes; (6) plaintiff's ability to walk for 30 minutes on a treadmill by April 2017, and her provider's encouragement to walk regularly at that time; (7) plaintiff's stable condition as of

June 2018; and (8) the lack of "'overt symptoms'" of congestive heart failure as of May 2020, with a need for only six-month follow-up visits thereafter. *Id.*; *see* R. 41 (noting cardiologist's description of plaintiff's congestive heart failure as "well compensated"), 400, 847.

The ALJ also reviewed plaintiff's reported activities of daily living and noted they typically involved walking around inside and short distances outside the house, exercising on a treadmill, preparing simple meals, cleaning and doing laundry, driving to and shopping for groceries, and lifting up to five pounds. R. 39–40; *see also* R. 55 (testifying to not lifting anything weighing over ten pounds).

Finally, and as discussed further below, the ALJ reviewed plaintiff's October 2020 hearing testimony and February 2020 function report, containing plaintiff's statements about her complaints, abilities, and limitations. R. 39–41.

Based on the foregoing substantial evidence, the ALJ reasonably concluded that plaintiff was not disabled and possessed an RFC for "restricted sedentary work." R. 40–41. The ALJ found that plaintiff's cardiac treatment had been "extremely . . . effective." R. 41. She also found plaintiff's physical conditions to "have remained relatively stable." *Id.* The ALJ also considered plaintiff's obesity and associated symptoms and functional limitations, in combination with her other impairments. R. 40. The ALJ found "no evidence of disabling musculoskeletal, respiratory, or cardiovascular impairment or that obesity is causing any other disabling problems." *Id.* Nevertheless, in considering both plaintiff's statements and her obesity, the ALJ recognized the need for some limitations in plaintiff's exertional and postural abilities and accounted for them in the RFC. R. 40–41.

Based on this record, the Court rejects plaintiff's assertion that the ALJ needed to develop the record further by seeking "quantification of [p]laintiff's restrictions" from her treating sources

22

or a consultative examiner.  Pl.'s Mem. 11.  Apart from plaintiff's mostly conclusory statements, the record, particularly as extensively documented in treatment notes and associated testing, is remarkably consistent about her recovery.  *See* 20 C.F.R. §§ 404.1520b(b), 416.920b(b); *see also* R. 40 (noting the absence of "'overt symptoms' of congestive heart failure").  When, as here, the record is extensive and reflects resolution of the acute cardiac event leading to plaintiff's hospitalization and treatment, the ALJ properly found the record sufficient to establish plaintiff's RFC and decide on disability.  Based upon the consistency and sufficiency of the record, no need existed for the ALJ to seek outside assistance with these administrative, agency tasks.  *See* *Caulkins,* 2022 WL 1768856, at *5 (declining to set aside the ALJ's RFC analysis "simply because the ALJ is a layman and did not obtain an expert medical opinion" and noting the suggestion to do so "misapprehends the agency's administrative review process") (internal citations and quotations omitted)).

2.    ***The ALJ's assessment of plaintiff's statements and testimony is supported by substantial evidence.***

Plaintiff's attack upon the adequacy of the ALJ's rationale for not fully crediting plaintiff's assertion of disabling limitations also misses the mark.  *See* Pl.'s Mem. 11–12.  Plaintiff understandably fears having another heart attack.  R. 316, 321.  Although she has not resumed working, she fears that workplace stress and anxiety will trigger just such an event.  R. 58–59. Plaintiff also made statements suggesting that fatigue, occasional shortness of breath, palpitations, and chest and arm pain, and her need for compensating rest and naps, preclude a return to work. R. 53–54, 322; *see also* R. 55–56 (noting she rarely exercises due to fatigue).  Apparently, due to fatigue stemming from her conditions, plaintiff reports limited abilities to sit or stand for long or engage in certain postural or exertional activities.  R. 57–58, 318, 322.  She also complained of an arthritic shoulder, knee and hip pain, and associated problems with sleep and swelling in her feet.

R. 56–57, 318.  Finally, the plaintiff also reported that her conditions reduced her attention span, her ability to follow instructions, her ability to get along with others, and her memory, understanding, concentration, and ability to finish tasks.  R. 322.

The ALJ's opinion, both directly and indirectly, addressed these matters and found many of plaintiff's claims at odds with the record.  R. 40–41.  The ALJ found no evidence of medically determinable mental impairments, or records supporting claims of anxiety or PTSD and related symptoms.  R. 38, 96, 109, 111, 124, 294, 309, 446.  The ALJ addressed plaintiff's complaints of back and hip arthritis and found a lack of objective evidence precluded classification of the same as medically determinable impairments.  R. 38 (noting negative tests and lack of imaging).  The ALJ also noted that at least one exam revealed no edema in plaintiff's extremities.  R. 40.  The ALJ pointed to plaintiff's repeated denials during office visits of chest pain or shortness of breath, as well as to her ability to walk about, exercise on a treadmill, and her cardiologist's encouragement to walk regularly.  *Id.*  The ALJ noted plaintiff's significant activities of daily living.  R. 39–40; *see also* R. 38 (noting absence of persistent heart failure symptoms very seriously limiting ability to engage in activities of daily living).  The ALJ also noted plaintiff's self-report that she was "feeling good," and her provider's notation that she was "doing well" and her condition was stable.  R. 40.

Although acknowledging that plaintiff's cardiac status and obesity could reasonably be expected to cause her alleged symptoms, the ALJ found plaintiff's statements about their effects to be less than fully consistent with the medical and other evidence of record summarized above.  R. 40–41.  While rejecting plaintiff's claimed inability to work, the ALJ crafted an RFC that reasonably credited and accounted for plaintiff's reports of fatigue, occasional chest pain and shortness of breath, and exertional and postural limitations.  *Id.*  The ALJ did so, while also noting

that the medical record reflected plaintiff's miraculous recovery, an ability to exercise, and few complaints of chest pain or shortness of breath. R. 39–41.

Moreover, the ALJ was less persuaded by the opinions rendered by the state agency physicians indicating that plaintiff could perform light work. Instead, based upon plaintiff cardiac status and obesity and "to accommodate [her] ongoing fatigue," the ALJ restricted plaintiff to sedentary work.[9] R. 41. The ALJ determined plaintiff could only perform a job involving sitting and restricted plaintiff to only occasionally standing, walking, and lifting of no more than 10 pounds. *Id.*; *see* 20 C.F.R. §§ 404.1567(a), 416.967(a). This lifting restriction was consistent with plaintiff's reports about the weight of items she previously lifted while working as a benefits clerk. R. 325. The limitation to sedentary work also necessarily accommodated plaintiff's testimony about needing to move about after sitting for 30 minutes, but rejected her claim that she could stand for only 10–15 minutes. R. 57–58. Finally, the ALJ limited plaintiff's postural maneuvers, R. 39, and "included additional restrictions on exposure to environmental factors and respiratory irritants, given the claimant's hearing testimony about occasional chest pain and shortness of breath." R. 41.

The foregoing demonstrates that the ALJ, before whom plaintiff testified at length, reasonably and fairly engaged with and weighed plaintiff's testimony and function report statements about physical and mental limitations, in light of all the evidence. Having addressed the substance of plaintiff's complaints, the ALJ need not have recited them chapter and verse.[10]

---

[9] The ALJ also implicitly accepted plaintiff's contention that she could not resume janitorial work. R. 58.

[10] This also finds support in the ALJ's consideration and adoption of "the assessment of the claimant's physical capacity from the prior [ALJ] decision," issued on August 21, 2018. R. 41, 70–77 (discussing testimony about chest pain after walking for 20 minutes and assertion that stress and exertion of working will exacerbate heart condition but finding plaintiff could perform

See *Gullace*, 2012 WL 691554, at \*24 (noting an ALJ need not discuss every piece of evidence in the record and the absence of such discussion or citation does not equate to a failure to consider) (citations omitted).   Rather than mischaracterizing and minimizing plaintiff's testimony, as plaintiff argues in conclusory fashion, Pl.'s Mem. 12, the ALJ exercised her authority to evaluate it and decided not to entirely accept plaintiff's complaints about her ability to work, need for rest, and mental health problems. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig*, 76 F.3d at 589 (noting that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on . . . the ALJ.") (internal quotation and citation omitted).   Likewise, for the reasons noted above, the Court is satisfied that the ALJ sufficiently considered plaintiff's function report, notwithstanding the decision's relatively brief reference to it. *See* R. 39–40 (discussing February 2020 function report).   Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence and comports with the law.

**B.**     ***Remand is inappropriate because, even after considering the post-hearing source statements of Dr. Robertson and NP Stewart, the ALJ's decision remains supported by substantial evidence.***

Plaintiff also seeks a remand contending that Appeals Council erred in rejecting her request for review based upon post-hearing evidence submitted by plaintiff. Pl.'s Mem. 13–15.  Plaintiff contends that the post-hearing evidence, comprised of source statements from Dr. Robertson and NP Stewart, constituted new and material evidence reasonably probable to change the ALJ's decision. *Id.* at 13–14.  This evidence, plaintiff argues, filled the gaps left by the ALJ's failure to develop the record and provided needed context confirming the credibility of plaintiff's testimony and other statements. *Id.* at 14.  Among other things, plaintiff argues that Dr. Robertson and NP

_____

sedentary work); *see also* R. 35 (giving findings of the prior decision "considerable deference").

Stewart's statements about plaintiff's likely time off task (20%) at work, limited ability to stand and walk (1–2 hours), need for breaks, need to elevate her legs (50% of the day), and expected monthly absences, establish a reasonable probability of a different outcome. *Id.* at 13–15.

The Commissioner argues that the subject source statements are neither new nor material. Def.'s Mem. 21–24. As to the first point, the Commissioner argues that, given plaintiff's lengthy treating relationship with both providers, the statements were effectively available to plaintiff before the ALJ hearing, and plaintiff and her attorney's failure to timely procure them should not be condoned. Def.'s Mem. 22, 22 n.4 (citing regulation requiring parties to give notice of, or submit written evidence, to SSA at least five business days before hearing date, *see* 20 C.F.R. § 404.935(a), and failure of counsel to advise the SSA and ALJ that the source statements would be forthcoming). Next, the Commissioner argues that the check-the-box forms supplied by Dr. Robertson and NP Stewart are entitled to little weight, particularly as they lack supporting narratives and are inconsistent with other record evidence, including the providers' treatment notes. *Id.* at 23–24. Finally, the Commissioner argues that, in light of the record evidence cited by the ALJ in assessing the RFC, the source statements are not needed to fill gaps in the record regarding plaintiff's limitations and abilities. *Id.* at 24. For all these reasons, the Commissioner contends that remand is unwarranted because the Appeals Council properly concluded that the source statements had no reasonable probability of changing the outcome. *Id.*

### 1.     *The post-hearing treating source statements by Dr. Robertson and NP Stewart*

The ALJ held a hearing on October 28 and issued a decision on November 13, 2020. R. 31, 47. On October 6, 2020, plaintiff's representative requested a treating source statement from NP Stewart. R. 22. On October 26, 2020, plaintiff's representative requested a treating source statement from Dr. Robertson. R. 13. On November 12, 2020, plaintiff's representative received

27

a faxed source statement completed and signed by NP Stewart. R. 21–30. Although plaintiff asserts that NP Stewart's statement was faxed to the ALJ the same day, one day before the ALJ's decision, Pl.'s Mem. 13 n.2, 15 (both citing R. 29), the record contains no such evidence and reflects only the sending of the fax from NP Stewart's practice to plaintiff's representative. *See* R. 29–30. On December 2, 2020, plaintiff's representative received a faxed source statement completed and signed by Dr. Robertson. R. 13–20.

Dr. Robertson's statement reported plaintiff's diagnoses as coronary artery disease and chronic systolic heart failure and noted plaintiff's condition had stabilized and her prognosis "seems good." R. 16. While identifying plaintiff's signs and symptoms as exertional dyspnea, exercise intolerance, and palpitations, Dr. Robertson did not check the boxes indicating, among other things, chest pain, weakness, peripheral edema, chronic fatigue, or pulmonary edema. *Id.*; *see id.* (also noting plaintiff has "no angina"). Dr. Robertson indicated that stress causes plaintiff's blood pressure to "elevate," and checked the box indicating she was "[i]ncapable of even 'low stress' work." R. 17. Dr. Robertson checked the box indicating that plaintiff's physical symptoms and limitations cause emotional difficulties and noted she is depressed and lacks interest in social activities. *Id.*

With respect to plaintiff's functional limitations in a "competitive work situation," Dr. Robertson: (1) checked boxes indicating plaintiff could sit and stand/walk less than two hours; (2) noted that plaintiff could walk less than one city block before needing rest or experiencing severe pain; (3) checked boxes indicating plaintiff needed to be able to shift positions at will and needed unscheduled breaks on an hourly basis, to accommodate her need to lie down and rest for roughly 15 minutes before resuming work; (4) checked the box indicating plaintiff needed to elevate her legs with prolonged sitting, and noted she would need to elevate them above her heart for 50% of

the work day to avoid swelling; (5) checked boxes indicating plaintiff could occasionally lift items weighing up to 10 pounds, but could never lift heavier items, and could occasionally twist, but never stoop, crouch/squat, or climb stairs/ladders; (6) checked the box indicating that plaintiff would likely be off task 25% or more in a typical work day; (7) checked boxes indicating plaintiff would have "good" and "bad" days and would likely be absent from work more than four days per month; and (8) indicated plaintiff's symptoms and limitations began April 2, 2016, and a reasonable consistency existed between her impairments and the functional limitations and symptoms he identified.  R. 16–19.

NP Stewart identified plaintiff's diagnoses as including congestive heart failure, ischemic cardiomyopathy, hypertension, hyperlipidemia, anemia, and arthritis.[11]  R. 25.  With respect to limitations resulting from plaintiff's physical condition, NP Stewart:  (1) checked boxes indicating that plaintiff would likely be off task 20% of a typical work day and could maintain attention and concentration for less than 30 minutes before requiring a break; (2) estimated plaintiff's likely monthly absences from work at two days; (3) checked boxes indicating that plaintiff could frequently lift/carry items weighing up to 10 pounds, but only rarely lift/carry items weighing 20 pounds, and never lift/carry items weighing 50 pounds or more; (4) checked boxes indicating plaintiff required an at-will sit/stand option at work, and could sit for up to 6 hours and stand/walk up to 1 hour in an 8-hour work day, stating as grounds therefor plaintiff's "echo[cardiogram]"; (5) checked boxes indicating plaintiff had no need to lie down, recline, or elevate her legs during the work day; (6) checked a box indicating plaintiff sometimes needs a cane for walking due to pain in her right hip and left leg, but reported she can ambulate one block without using it; (7) checked

---

[11] As plaintiff filed her claims after March 26, 2017, it appears that NP Stewart is an acceptable medical source.  *See* 20 C.F.R. §§ 404.1502(a)(7), 416.902(a)(7).

boxes indicating that, due to right shoulder osteoarthritis, she can only occasionally reach overhead and push or pull, can only frequently otherwise reach, but has no limitation in handling, fingering, or feeling; (8) checked boxes indicating plaintiff can no more than frequently use foot controls; (9) checked boxes indicating plaintiff could occasionally climb stairs/ramps, rarely kneel, never climb ladders, and never balance, stoop, crouch, or crawl; and (10) checked boxes indicating plaintiff could never work at unprotected heights or with moving machinery, could rarely work in extreme temperatures, but could frequently operate a vehicle, work in around vibrations, humidity, and pulmonary irritants.  R. 25–28.

### 2.    *Appeals Council consideration of source statements*

Plaintiff submitted Dr. Robertson and NP Stewart's source statements to the Appeals Council with her request to review the ALJ's decision.  R. 2; *see* 20 C.F.R. §§ 404.968(a) (directing submission of any evidence for Appeals Council consideration with the request for review), 416.1468 (same).  The Appeals Council noted plaintiff's obligation to show that the evidence was new, material, related to the period of claimed disability, created a reasonable probability of a different result, and that good cause existed for the untimely submissions.  R. 1–2; *see* 20 C.F.R. §§ 404.970(a)(5), (b), 416.1470(a)(5), (b); *see also Meyer v. Astrue*, 662 F.3d 700, 704–05 (4th Cir. 2011).  To be considered "new," the evidence must not be "duplicative or cumulative." *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citation omitted).  To be considered "material," there must be "a reasonable probability that the new evidence would have changed the outcome."  *Id.* (citation omitted).

The Appeals Council denied plaintiff's request for review.  R. 1.  In doing so, the Appeal Council only explicitly addressed one of the predicates for review.  With respect to the source

statements included in the administrative record, it found "this evidence does not show a reasonable probability that it would change the outcome of the decision." R. 2.

### 3.    *Substantial evidence continues to support the ALJ's decision.*

When the Appeals Council "denies review, the decision of the Commissioner [the ALJ's decision] becomes the final decision." *Gainforth v. Colvin*, No. 2:15cv205, 2016 WL 3636840, at *8 (E.D. Va. May 9, 2016), *report and recommendation adopted*, 2016 WL 3636621 (E.D. Va. June 29, 2016). The Court does "not evaluat[e] the Appeals Council's *denial of review*." *Id.* at *10. Accordingly, the Court turns to examining whether "after considering the additional evidence, substantial evidence still supports the ALJ's decision." *Crowder v. Berryhill*, No. 2:17cv186, 2018 WL 5305089, at *13 (E.D. Va. May 18, 2018), *report and recommendation adopted*, 2018 WL 4565395 (E.D. Va. Sept. 24, 2018); *see also Parham v. Comm'r of Soc. Sec.*, 627 F. App'x 233, 233 (4th Cir. 2015) (per curiam) (citing *Wilkins*, 953 F.2d at 96; also citing *Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014)).

Substantial evidence supports the ALJ's determination that plaintiff was not disabled from August 17, 2018, through November 13, 2020, and that she could return to working as an insurance and benefits clerk. R. 34–42. Considering the source statements in light of all the record evidence fails to alter that conclusion for the following reasons. First, neither of the two statements relies upon new examinations, testing, findings, or any deterioration in plaintiff's condition, either during or after the period of review. Thus, the ALJ reviewed and considered the full record of plaintiff's course of treatment with Dr. Robertson and NP Stewart and that record remains unchanged. This is also significant because, although both Dr. Robertson and NP Stewart may properly opine about plaintiff's symptoms and limitations, the determination of whether plaintiff is disabled is reserved to the Commissioner (or her designee, the ALJ). *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th

Cir. 2012) (noting the ALJ's responsibility for deciding the question of disability in the face of conflicting evidence) (citations omitted); *see also* 20 C.F.R. §§ 404.1546(c) (specifying the ALJ's responsibility for assessing a claimant's RFC), 416.946(c) (same).

Second, inasmuch as the treating physician rule no longer applies, the opinions of plaintiff's treating sources are not entitled to any special weight. *Compare Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (referencing "great weight to be accorded) *with* 20 C.F.R. § 404.1520c(a) (no longer deferring to or attributing any specific or controlling weight to treating source opinions for claims filed on or after March 27, 2017). Instead, under the new rules, medical opinions are assessed for persuasiveness.[12] 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other").

Third, each of the check-the-box opinions supplied by Dr. Robertson and NP Stewart lacks meaningful content and explanation. This greatly diminishes the significance plaintiff attaches to them. As this Court and others have noted in evaluating opinion evidence, unadorned source statements like these are not particularly useful. *See Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3, *12 (E.D. Va. Apr. 2, 2015) (noting a "distaste . . . for medical reports that do not contain at least a minimal amount of written explanation" and characterizing the same as "weak evidence at best") (citing *McConnell v. Colvin*, No. 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013)); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). The same is true here. Although Dr. Robertson and NP Stewart both wrote a few, minor comments on their statements,

---

[12] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments. 20 C.F.R. §§ 404.1513(a)(2)(i)–(iv), 416.913(a)(2)(i).

each statement lacks a narrative explanation about how and why plaintiff's conditions support the limitations noted in the checked and marked forms.

Fourth, neither statement meaningfully attempts to correlate the opined limitations with the examinations, test results, and findings that the sources themselves made during the treatment relationship. For example, Dr. Robertson's statement lists diagnoses of coronary artery disease and chronic heart failure. R. 16. It fails, however, to discuss the diagnoses relative to the fact that, by mid-2017, plaintiff had cardiac check-ups only once every six months. Nor does it attempt to reconcile the same with Dr. Robertson's December 27, 2018 reference to plaintiff's "miraculous" recovery, based on the absence of "symptoms of heart failure," a normal exam, ejection fraction, and lab work, and the lack of the need for continuing antiplatelet therapy. R. 400–01.

Similarly, Dr. Robertson's statement indicates that plaintiff's legs need to be elevated above her heart 50% of each work day, due to swelling, and that her symptoms include palpitations. R. 17–18. During plaintiff's regular visits to his office, however, treatment notes reflect that plaintiff regularly denied having any leg swelling or palpitations, and never referenced plaintiff elevating her legs or needing to do so. R. 395, 401, 410, 421, 433, 453, 458, 465, 468, 472, 475, 483, 848; *see also* R. 430, 463.[13]

Similar discrepancies exist between Dr. Robertson's treatment records (as well as other records) and his source statement opinions that plaintiff suffers from emotional difficulties, including depression and self-isolation, and cannot walk even a block without resting or severe pain. *Compare* R. 17 *with* R. 400 (encouraging plaintiff to exercise), 406–07 (reporting daily

---

[13] In spite of her repeated denials of swelling at the cardiologist's office, plaintiff complained in her function report of sleeping problems, due to hip and leg pain and swelling in her feet. R. 318. If credited, such a statement suggests that swelling may only be an issue when plaintiff reclines.

exercise), 421, 436–38 (noting plan to join gym and exercise regularly, increased activity tolerance and energy, ability to walk for half hour, and positivity and motivation), 441, 446 (denying anxiety or depression), 449 (reporting only "mild depression"), 453 (negative for depression), 463 (mood normal), 465 (back at work); *see also* R. 322 (plaintiff's reporting in February 2020 that she can walk a "[q]uarter of mile before needing to stop and rest").

Similarly, Dr. Robertson's comments in the source statement that "stress makes B/P elevate" and his unexplained checkmark opinion about plaintiff's inability to do low stress work, are at odds with his December 27, 2018 treatment notes listing her blood pressure as "well controlled." R. 400–01. In fact, although plaintiff sometimes presented with elevated blood pressure, treatment notes appear to attribute this to a failure to take medication and/or reflect treatment with increased medication dosage, without further incident. R. 393, 395–96, 409–11, 420–22, 432–33, 451–53, 458, 465, 468, 472, 849.

Dr. Robertson's opinion that plaintiff is incapable of even low stress work, also conflicts with his own treatment notes for October 13, 2016. Those notes indicate that plaintiff is "doing great" and "is back to work." R. 465. Although the record contains no other evidence that plaintiff resumed working at that time, what is remarkable is that Dr. Robertson's treatment notes nowhere indicate that any such work was ill-advised due to medical reasons or functional limitations or that plaintiff's condition precluded work. Moreover, as already discussed, it is undisputed that plaintiff's condition continued to improve after October 13, 2016. Against this backdrop and because the source statement contains little to no explanation or correlation with plaintiff's treatment history, Dr. Robertson's other bare opinions regarding plaintiff's ability to sit, stand, and walk, any need for breaks and changing positions, time off task, and expected absences provide insufficient grounds for setting aside the ALJ's RFC finding and disability determination.

The same kinds of problems plague NP Stewart's four-page source statement. For example, her opinions that plaintiff is likely to be off task 20% of any given work day, is only able to maintain attention and concentration for less than 30 minutes, and will likely be absent two days per month from work, lack any explanation of the bases therefor. R. 25; *cf.* R. 322 (plaintiff reporting in February 2020 that she can pay attention for "1 hour"). Such opinions not only conflict with the ALJ's well-founded conclusion about the lack of mental impairments claimed by plaintiff, including anxiety and PTSD, *see, e.g.*, R. 38, 96, 124, 309, 446, but also are at odds with NP Stewart's treatment notes. For example, those notes regularly report a "negative" for plaintiff having any psychiatric/behavioral symptoms and that her mood/affect is "normal." R. 407, 430–31, 441, 463, 478, 487, 1006–07, 1021, 1023. Those notes also describe plaintiff's improving physical condition over time, including denials of chest pain, serious fatigue, and shortness of breath. R. 406, 416, 430–31, 440–41, 463, 1021; *see* R. 406–07 (noting plaintiff "exercises daily"), 1021 (noting onset of plaintiff's congestive heart failure several years ago, "with improving course since that time," and absence of complaints of ongoing symptoms).

Similarly, NP Stewart opines that plaintiff could sit for up to six hours and stand/walk for one hour in a work day and needed a sit/stand option, and lists as the basis therefor plaintiff's echocardiogram results. R. 26. As previously noted, however, Dr. Robertson and NP Balgavy both characterized plaintiff's ejection fraction from the August 15, 2017 echocardiogram as "normal" or nearly normal. R. 400–01, 421; *see* R. 589 (listing plaintiff's left ventricular systolic function as "low normal"). Although NP Stewart assesses plaintiff's ability to sit as substantially greater than Dr. Robertson and opines that plaintiff has no need to elevate her legs at work, she also provides little to no explanation for her opinions.

Finally, the unexplained discrepancies between Dr. Robertson and NP Stewart's treatment notes and the source statement opinions suggest that the practitioners relied upon and gave greater weight to plaintiff's assertion that she was unable to return to work. *See* R. 58–59. The making of such credibility determinations in the context of a disability determination, however, rests with the ALJ, rather than the Court or plaintiff's treating providers. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig*, 76 F.3d at 589 (noting that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on . . . the ALJ."). Unlike Dr. Robertson (and NP Stewart), the ALJ had the benefit of reviewing the entire longitudinal record of plaintiff's treatment, with multiple providers, as well as plaintiff's activities of daily living, testimony under oath, and her other statements supporting her disability claim. Having done so, the ALJ rejected plaintiff's assertion of work-preclusive symptoms and limitations. That record provides, and the ALJ's decision documents, a valid basis for the ALJ's RFC assessment and disability determination. Accordingly, the Court agrees with the Appeals Council that the treating source opinions do not give rise to a reasonable probability of a different outcome. Having considered the additional opinions from Dr. Robertson and NP Stewart in light of the entire record, the Court concludes that substantial evidence supports the ALJ's decision.

## VI.    **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 17) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 19) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 29, 2022